## CREVELING *v.* JEPSON.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE.

1. In an interference involving the invention of an electric distribution system, priority was awarded the junior party, where it appeared that an apparatus constructed by him which embraced the entire system of distribution involved was given a complete and satisfactory test, and so reduced to practice prior to the filing date of the senior party.

2. Where in an interference involving the invention of an electric distribution system, none of the counts referred to a car-lighting system, but the junior party constructed and tested an apparatus designed for use in the service of car lighting, and some question was made as to the sufficiency of the test respecting the car-lighting feature on account of the lack of an automatic pole changer, which became necessary only in case the generator should be reversed when needed by a reverse operation of the car, it was *held* that it was not necessary, in order to test a current and voltage regulator, that the generator be reversed, although conditions in practice might arise where a reversal would occur often enough to make this important, and that the standard of the test required to show reduction to practice should not be greater than the counts of the interference called for.

No. 1006. Patent Appeals. Submitted January 13, 1916. Decided February
7, 1916.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference proceeding.          *Affirmed.*

The facts are stated in the opinion.

*Mr. C. H. Duell, Mr. F. P. Warfield, Mr. H. S. Duell,* and
*Mr. T. J. Johnston* for the appellant.

*Mr. Richard Eyre, Mr. Gorham Crosby,* and *Messrs. Kenyon
& Kenyon* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the
Court:

This is an interference proceeding involving the invention
of an electric distribution system.

The issue is in the following counts:

"1. In an electrical system of distribution, a main generator,
a battery arranged to be charged thereby, a carbon pile in the
field circuit of the generator for regulating its voltage, two
levers acting on said pile mechanically independent of one an-
other, an electro-magnet for operating one of said levers re-
sponsive to battery current variations, and an electro-magnet
for operating the other lever responsive to battery voltage varia-
tions.

"2. In an electrical system of distribution, a main generator,
a battery arranged to be charged thereby, a carbon pile in the
field circuit of the generator for regulating its voltage, two
levers acting on said pile mechanically independent of one an-
other, one lever acting upon one end of the pile and the other
lever acting on the other end of the pile, an electro-magnet for
operating one of said levers responsive to battery current varia-
tions, and an electro-magnet for operating the other lever re-
sponsive to battery voltage variations.

"3. In an electrical system of distribution, a main generator, a storage battery and work circuit supplied thereby, a carbon pile for regulating the voltage of the generator and two levers acting mechanically independently on said pile, means for operating one lever affected by battery current variations, and means for operating the other lever responsive to voltage variations of the battery.

"4. In an electrical system of distribution, a main generator, a storage battery and work circuit supplied thereby, a carbon pile for regulating the voltage of the generator and two levers acting mechanically independently on said pile, means for operating one lever responsive to battery current variations, and means for operating the other lever responsive to voltage variations of the battery and arranged to be brought into operation to regulate the voltage of the generator when the battery has become substantially charged.

"5. In an electrical system of distribution, a generator, driven at a variable speed, a work circuit arranged to be fed thereby, a carbon pile for regulating the voltage of the generator, a lever operating upon one end of said pile, and a lever operating on the other end of said pile, said levers operating responsive to variations in voltage of the battery and battery current variations respectively.

"6. In an electrical system of distribution, a main generator and its circuit and load, rheostatic apparatus arranged to regulate the voltage of the generator and two coils acting to independently mechanically control said apparatus to regulate its action, one of said coils controlling responsive to voltage changes of the battery and the other controlling responsive to battery current changes.

"7. In an electrical lighting system, a main generator driven at a variable speed, a storage battery connected to be charged thereby, rheostatic apparatus arranged to regulate the field of the generator, and two coils acting to control said apparatus mechanically independently of one another, one of said coils controlling responsive to voltage changes of the battery and the other coil controlling responsive to current changes of the battery.

"8. In an electrical system of distribution, a main generator driven at a variable speed, a storage battery and work circuit supplied thereby, rheostatic apparatus for regulating the voltage of the generator, two levers independently mechanically acting upon said apparatus to control the same, a coil regulating the action of one of said levers responsive to current changes of the battery, and a coil regulating the action of the other lever responsive to voltage changes of the battery to limit the rise in generator voltage.

"9. In an electrical system of distribution, a main generator, a storage battery arranged to be charged thereby, and carbon pile rheostatic apparatus for regulating the field of the generator, said apparatus including two levers for independently mechanically controlling the apparatus, a coil for controlling the action of one lever responsive to battery current variations to maintain a substantially constant charging current until the battery has become substantially charged, and a coil for controlling the action of the other lever responsive to voltage variations of the battery to limit the rise in voltage of the generator when the battery has become substantially charged.

"10. In an arrangement of the class described, a resistance medium whose resistance varies with variations in pressure thereon, a lever operating upon one end of said medium to vary the resistance thereof and a lever independently operating upon the other end of said medium to vary the resistance thereof.

"11. In an arrangement of the class described, a resistance medium whose resistance varies with variations in pressure thereon, a lever operating upon one end of said medium to vary the resistance thereof and a lever independently operating upon the other end of said medium, and an electro-magnet for controlling the operation of each lever."

John L. Creveling's application was filed November 22, 1909.

John W. Jepson's application of January 9, 1911, is a division of an application filed October 14, 1910.

Jepson's preliminary statement alleged conception in April, 1908, and a disclosure to others at the same time; that he con-

structed a full-sized apparatus in October, 1909, and reduced it to practice in November, 1909.

Creveling alleged conception and disclosure to others in the year 1900; the making of sketches in the same year; that he never made a model of the invention, and that it was first embodied in a full-sized working machine which was completed during the year 1901, and was successfully operated during the year 1901.

The tribunals of the Patent Office all agreed in awarding priority to Jepson, and Creveling has appealed from the final decree of the Commissioner.

The Examiner of Interferences found that Jepson's evidence tended to show conception as early as May 2, 1908, and that Creveling was confined to his date of filing application for both conception and constructive reduction to practice.

He denied Jepson's reduction to practice as claimed, but held that he had shown sufficient diligence since before Creveling's entry in the field to entitled him to the award of priority.

The Examiners in Chief found that Jepson first conceived the invention in 1908. They agreed with the Examiner of Interferences that Jepson's proof of reduction to practice was not sufficient, but agreed with the latter that he was using due diligence when Creveling entered the field, and thereafter affirmed the award of priority to Jepson.

The Commissioner on appeal agreed with the Examiners in Chief, awarding priority to Jepson. He held that Jepson's trial of his apparatus about November 1, 1909, was a reduction to practice.

In the view that we take of the case it is immaterial to examine the evidence of Creveling's conception as alleged by him, and its disclosure to Hallock, and we shall confine ourselves to Jepson's evidence of reduction to practice, for this, preceding Creveling's filing date, and would relieve him from the burden of proving diligence and entitle him to the award of priority.

The evidence of competent witnesses shows that the apparatus of Jepson constructed by him in working form was tried in the

test room of the Gould Coupler Company on or before the 1st of November, 1909, which was prior to Creveling's filing date.

The evidence referred to above shows that the whole apparatus constituting the system consisted of a generator, lamp circuit, battery circuit, and generator regulator, connected up in their respective relations. The apparatus was given complete test by varying the speed of the generator, varying the lamp loads, with and without battery, and was also given a long run to charge the battery up to its full state so that the apparatus would function by the potential coil usurping the control and causing the series coil to release its plunger and become inactive. In fact it was given every test that could be given a piece of car-lighting apparatus. There had been controversies at times with respect to vibrations, but this was proved to have no effect as apparatus for building them with dash pots that took care of all these conditions, and these principles are substituted in this apparatus for securing the same results with regard to vibration. The test was satisfactory in every respect, the apparatus performing every function for which it was designed. There was some question made as to the sufficiency of this test respecting a car-lighting apparatus on the account of the lack of an automatic pole changer, which became necessary only in case the generator should be reversed when needed by a reverse operation of the car. The Commissioner, taking the view that this test was sufficient, stated: "As to the lack of an automatic pole changer, it is not necessary, in order to test a current and voltage regulator, that the generator be reversed, although conditions in practice may arise where a reversal will occur often enough to make this important.

"If the issue was limited to a car-lighting system, the situation might be different, but the issues are not so limited, and the mere fact that Jepson designed his device for use in the severe service of car lighting does not seem to me to warrant raising the standard of the test required beyond what the issues would indicate."

We agree with the conclusion of the Commissioner. The thing reduced to practice was the invention of the issue; none

of the counts referred to a car-lighting system. It is true that the invention may be chiefly useful in an axle-driven system, but the invention is designed for other systems as well. The generator may be driven from any suitable source of power, and is useful in any system where a storage battery is charged from a generator, the speed of which is not constant.

As before intimated, this conclusion renders it unnecessary to consider the evidence relating to Creveling's conception and to the want of diligence in Jepson.

The decision of the Commissioner is affirmed, and the clerk will report this decision to the Commissioner of Patents as required by law.                    *Affirmed.*